181682 Jonathan Leite v. Matthew Goulet Attorney King Good morning. May it please the court, Benjamin King for the appellant. Would you tell us how to pronounce his name? Absolutely, Jonathan Leite. May I please reserve three minutes for a moment? How long? Three minutes. The question before the court is whether sufficient evidence exists in the record that the defendant Bergeron had a sufficiently culpable state of mind to rise to the level of deliberate indifference, leading to her failure to procure timely medical attention for Jonathan Leite, who suffered a brutal assault at the hands of other inmates. And to answer that question, I think you have to start with the principle that subjective intent can be inferred from behavior. Looking at the facts of the record, in the light most favorable to Jonathan Leite, as the district court was obligated to do, as we hear on an entry of summary judgment, the of cell block F, where Jonathan Leite was housed. She entered the cell block, and the video evidence shows she walked briskly past all the cells, keeping her eyes straight forward such that the jury could reasonably infer she failed to look in any cell that she was in. I'm told that the video is not very distinct, and at some point it appears like she may be turning her head. Do you dispute that? I dispute that. I agree that the video is indistinct. And you think it clearly establishes that she never turned her head at all? I think a jury can infer from watching that video that she did not turn her head. Yes, the video depicts her walking straight ahead, looking straight to the wall where she would exit the cell. Okay, and then let's assume hypothetically that's true. What do you draw from that? Well, it's sufficient to impose liability under Farmer v. Brunt if a corrections officer disregards a known substantial risk of serious harm to an inmate. Here, the defendant, Bergeron, acknowledged that she knew that inmates were subject to excessive risk in their cells. She knew that inmates could be found That's general harm versus specific type of harm. Do you agree with that? The risk of general harm versus the risk of specific harm to an individual. I think the distinction that you're identifying, Your Honor, is that there is a generalized risk of harm to inmates in a correctional facility. Corrections facilities are places where violence occurs. And corrections officers can't be held responsible for preventing all violence that occurs in a corrections facility. But there is an excessive, there is a heightened risk of harm to inmates in their cells. And that's particularly true at the Northern New Hampshire Corrections Facility, because in the common area, the inmates are subject to video surveillance. There's no video surveillance in the cells. And so the corrections, every corrections officer that we've posed in this case, acknowledged that the corrections officer bears a duty to look in the cells because If she had looked, what would she have seen? I'm not sure what your closing argument is to the jury, if you get that far, because the inmates had covered this up pretty well. And if she had just looked, which is what you're saying she should have, I still can't figure out from this record what she would have seen, particularly when the government explains that there's a difference between a rounds and a count. Right. She would have seen Jonathan Late in the cell. And for one thing, the defendant Bergeron was very well acquainted with the defendant Late, both from his prior incarceration at the Northern New Hampshire Corrections Facility and based on the fact that she monitored visits. So she acknowledged, it was undisputed in the record, she knew this inmate. But didn't they cover him up? Didn't they cover him up? They put him in the bed and covered him up. There was no testimony that his face was covered. There was no testimony that you couldn't see who it was. In addition, there were two inmates assigned to this cell, Ryan Elliott and Jonathan Jelinas. Jonathan Late was not an inmate assigned to that cell. And the defendant Bergeron knew that, or at least the jury could reasonably infer that she knew it, because four days before this assault occurred, the defendant Bergeron had done count twice. And on each of those occasions, she had verified that Jonathan Late was where he belonged in Day Room Bunk 1T, and that Ryan Elliott and Jonathan Jelinas were where they belonged in Cell 9. So, from those facts, a jury could infer that if she had bothered to look in the cell, she would have seen Jonathan Late there, whom she knew, and she would have realized that he didn't belong there. Now the Northern New Hampshire Correctional Facility had a strict policy against cell hopping, and that is one of the reasons why corrections officers all testified differently than others. So, we have to look in each cell uniformly. We know we have to look in each cell. Before you, I want to just... Yes. The issue of whether she would have seen him, I take it relates to causation, rather than her state of mind? It does. Okay. So, with respect to state of mind... Yes. When you say that she had a culpable state of mind... Yes. If the evidence was that her usual practice was to be meticulous in looking in cells, but the evidence also showed what you say it shows here, that in this particular instance, doing the rounds, the video shows what it shows, would that suffice to show that she had a culpable state of mind? I think so, Your Honor. Okay. There's a case actually cited in the defendant's brief that's helpful. It's James v. Harris County from the Fifth Circuit, and it says that how you distinguish between negligence and deliberate indifference is whether the conduct amounts to an unintentional oversight or an intentional choice. What would be the evidence that was an intentional choice here, apart from just the way she walked? Well... That's it. I'm not saying that there has to be more. It's not purely. If the corrections officer is walking straight ahead, looking straight ahead, not looking into the cells, I think that's an intentional choice. Given that she blitzed through this round in 47 seconds, that's an intentional choice. And given that the undisputed evidence was everything was all clear in the prison and there was no exigency requiring her to blitz through this round and not look into cells, that's an intentional choice. Thank you. Good morning, Your Honors. Frank Fredericks. The record does not reflect that the plaintiff's housing block was known for violence. The record does not reflect that the inmates who attacked the plaintiff were known for violence. It doesn't reflect that the plaintiff was a vulnerable individual or ever reported that he was at risk. So just simply an officer knowing that around a part of that is looking into cells, that's not a mental state akin to criminal recklessness. Just so I get the government's position, assume the causation thing would not be a barrier to the plaintiff's claim surviving. So assume the evidence was enough that the jury could find if she had looked, she would have seen something that would have enabled her to help the prisoner. And I know this is not what happened, but I just want to stay on the government's argument. Suppose the video showed the Bergeron walking through the cell with a blindfold on. Through the block. Through the block with a blindfold on. Would there be liability? I mean, maybe a better way to look at it is why don't you skip the entire... I want to look at it my way. Sorry. Because then... I understand your point. No, I don't think so. Because there's not that heightened substantial risk that we're talking about. When the officers testified, we looked in the cells. So she would not have a culpable state of mind. To have a culpable state of mind, it's not enough that there's a generalized risk which she is deliberately indifferent to. Correct. There needs to be something more. And the case law reflects that. There are prison procedures set up. Sometimes officers aren't operating with optimal attentiveness. But unless there is some concrete particularized fact that they knew or awareness that they had... So if she walked through with a blindfold and a sign saying, I don't care what's going on in these cells, still no liability. Or a jacket that says... I don't care, yeah. Still no liability. Yeah. She would be saying... What's your best case for suggesting that even in that situation there's no liability? So she made a choice to communicate, I don't care. And I'm not going to do this round. But there is case law where officers don't do a round that they're required to do by policy. In those cases, as I understand it, what they suggested is the reason it's not a problem is because there's some reason to think it was negligence or they had some reason not to do it. If we know that she is walking through deliberately indifferent, the question then is, is that the kind of deliberate indifference, given the nature of the risk, that can give rise to liability? You're suggesting even then, no. And I'm trying to see what's the best case for that proposition. Because it's what are you being deliberately indifferent to? This is a medium security prison. There's counts happening. There's rounds happening. There's not a record here where this was a unit where people were being assaulted left and right and left in their cells. Does that mean then that the jail could have a practice of no rounds and not be liable? The warden could order all of its people, we're not going to do any rounds because we don't care what's going on in the cells, and there would be no liability? If there had never been a security issue? No. There's a record here of the nature of the security issue that there is, which is there's cell hopping, which sometimes is dangerous. It can be dangerous to be in a cell, but there's nothing more than that general risk. And the warden says, my policy is because I don't care what's going on in the cells, no one will look at them. No rounds ever again. I think that that would exist. I thought there was a distinction between the rounds and the head check. There is. Okay. So I'm not, I assume Judge Barron's question is not only no rounds, but no head checks, no body counts, no looks whatsoever. No. I want to just limit it to, because here we know that there are head checks. There's no indication she didn't do head checks. She did do the head check. That's when she found him, yes. So just with respect to rounds, the warden could have a policy of no rounds without being liable? No. I think that that is problematic because that's... But then if that's problematic, why isn't it problematic for an officer to walk through, point to a round, making it clear that she's deliberately indifferent to what's going on in the cell? She walked through, she did her round. She was present on the unit. But now you're just contesting whether she was really looking or not. So that's why I started with the blindfold. Then it's just a matter of does this record show enough about her state of mind? What I'm going to keep going back to is she needs, there's no indication that she, when we think about deliberate indifference or willful blindness, you're being willfully blind to, it's, I have reason to believe there's a problem here, a problem, but I'm not going to confirm that suspicion. And that's not what happened. She didn't have any reason. This was a quiet afternoon where most of the, well, potentially half of the inmates were out in the yard. So she did and she walked through. So the idea is on this particular round, there wasn't enough of an indication of a risk, even though you might say in aggregate, if the policy was no rounds, that would be a problem because you'd have to think at some point there's going to be a risk. Correct. I got it. I'm curious about one thing. Yes, Your Honor. So Judge Barron started with let's take causation off the table and let's assume she walked through blindfolded and you said that's not enough. She's got to be deliberately indifferent to a known risk. Okay. So we do have testimony from the plaintiff that she had a habit of not looking into the cells. So which way does that cut? Does that help your case or does that help the plaintiff's case? I don't think it's material one way or the other because I think we do need to focus on this round and what she knew on that day and what she knew about that unit. Yes, but then Judge Barron took you down the path of, okay, she's got a blindfold, she has some insignia, I don't give a damn, and the warden also, while he does have head checks every hour, he doesn't have rounds. And you said, well, gee, that's more problematic. And in that context, she says, eh, it was my habit not to look into the cells. I've learned from experience it slows me down. There's almost never anything to see. Does that help you or does that help him? I think in going back to Justice Barron's final question to opposing counsel. I'm sorry. What I think he was training in on was a change in her practice. No, I know what he was training in on. I'm asking you to answer the question I put to you. I do believe it's immaterial or alternatively that it would help the defense, because it would indicate that the fact that she hadn't done this in the past, according to your hypothetical, because there's not much to see, goes to her state of mind, which is not acting with criminal recklessness. Okay. Thank you. Unless there's anything further, I will conclude. Thank you. Mr. King, three minutes. I think the state's position is getting away from this constitutional obligation that was set forth in Farmer, that this court pronounced in Giroux, that corrections officers have a constitutional duty to take reasonable measures to provide for the safety of inmates. And when the state said that Bergeron could walk through the cell with a blindfold on and still escape constitutional liability, that's ignoring the doctrine of willful blindness, which this court has said is not mere negligence. It's worse than mere negligence, because it's directed to a form of scienter in which the official culpably ignores. But he says you have to be willfully blind to some things. Yes. And then he's saying just the generalized risk on a single round is not high enough. So it's hardly an attractive thing for a person in a prison setting as a guard to do or appropriate thing. But whether it's a constitutional violation, the idea is since it's a single round and a particular day and time of the round, even if she was completely indifferent to it on that day, that doesn't show that she had indifference to the kind of thing that would give rise to a constitutional liability. Whereas if the claim was she always did her rounds this way, by aggregating all the different days and all the different rounds, the risk gets greater, and then you might say, well, then there would be constitutional liability. What's your answer to that? One, she knew. I think this whole notion of generalized risk is misleading in the context of this case. Because we're not talking about a generalized risk of harm to inmates in the prison that they may get stabbed or may get assaulted anywhere. We're talking about the risk that exists to inmates in cells when they cell hop and they go into different cells, the risk that exists there, particularly given the lack of video surveillance. Secondly, there is evidence in the record that although Bergeron knew of the heightened risk of inmates in cells, that she knew she had to look in there to make sure they weren't hanging up, to make sure they were well and they were safe. She says all this in her deposition testimony. We have the deposition testimony of Jonathan Lake, who says, I observed Bergeron doing rounds on numerous occasions, and her pattern was to get off the cell block as quickly as she could, and that she habitually did not look in cells. How do you address your brother's argument that this is a medium security prison that didn't have a history of that kind of violence, specific incidents of violence? So essentially she's not indifferently, she's not intentionally indifferent to something that had never existed in that particular section. Well, I would dispute that characterization, Your Honor, based on the deposition testimony from other corrections officers, that inmate on inmate violence more commonly happened in cells, and that all the corrections officers knew they had to look in the cells to make sure that the inmates were safe, and that the shift commander said he would view it as a dereliction of duty if a corrections officer did not look in the cells. I don't think you've been responsive to the question that was asked. This was a medium security prison. No history of prior events. And he also mentioned a third thing. I want to know if there's a factual dispute that, in fact, many of the inmates were out in the yard and not within their cells at the time of this particular walk-through. Is that correct? Some of the inmates were out in the yards. The video evidence depicts that several inmates remained on the block. There are inmates... So some are outside, some are on the block. Exactly. And you agree that it was medium and that there wasn't a history? I agree that it was a medium security prison. I don't agree that there was no history of violence here, and I don't agree that there was no... I think there was a duty on behalf of Bergeron, if she's going to do a round, to look in the cells. Corrections officers uniformly said that they had to do. What does the record show about past violence in this facility? All I can cite to Your Honor right now is the deposition testimony saying that inmates fought in cells. That's where fighting would most frequently occur, and that's where most incidents of inmate-on-inmate violence occurred was within the cells. Thank you. All rise.